UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Olukayode David Ojo,<br><br>                    Plaintiff<br><br>— against —<br><br>United States of America, Warden Frank Strada, Assistant Warden White, and John Doe 1 (Medical Director),<br><br>                    Defendants. | **15-cv-6089 (ARR) (LB)**<br><br><br>**Not for publication**<br><br><br>**Opinion & Order** |

ROSS, United States District Judge:

*Pro se* plaintiff Olukayode David Ojo is suing the United States and various officials at the

Metropolitan Detention Center (MDC) in Brooklyn, alleging that he received inadequate dental

care while he was a pretrial detainee at MDC. Ojo's complaint raises twelve claims under *Bivens v.*

*Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort

Claims Act (FTCA). The defendants have moved for summary judgment on all but one of these

causes of action—Ojo's claim that he received negligent dental care in violation of the FTCA (the

fifth cause of action). For the following reasons, the defendants' motion is granted in part and

denied in part.

## BACKGROUND

On July 11, 2011, Ojo was admitted into the custody of the federal Bureau of Prisons

(BOP) as a pretrial detainee at the MDC. Defs.' Local Civil Rule 56.1 Statement of Undisputed

Facts ¶ 1, ECF No. 60 ("Defs.' 56.1 Statement").[1] On August 8, 2013, following a jury trial, Ojo

was convicted of one count of conspiracy to commit wire fraud and one count of conspiracy to

---

[1] Unless otherwise noted, all citations to the electronic docket refer to case no. 15-cv-6089.

possess with intent to unlawfully use five or more identification documents. *Id.* ¶ 4. I was the judge who presided over his criminal trial. On February 27, 2014, I sentenced Ojo to 37 months of imprisonment. *See* J. of Conviction, 13-cr-334, ECF No. 75. He was released from BOP custody shortly thereafter, on March 14, 2014. Defs.' 56.1 Statement ¶ 6.

This civil action concerns the dental care received by Ojo—or lack thereof—during the time he spent in pretrial incarceration at MDC. The parties hotly dispute the details of this care.

## A. Defendants' account of Ojo's dental care

Defendants claim that Ojo first sought dental care at MDC on October 13, 2011, when he complained of a painful tooth, which he had been experiencing for several years. *Id.* ¶ 42. Pamela Hamilton, D.D.S., a dentist at MDC, diagnosed him with a "periapical abscess without sinus" and provided him with amoxicillin and ibuprofen. *Id.* ¶ 42. Ojo visited Dr. Hamilton again on December 4, 2012, complaining of a "'broken tooth,' which had been 'broken for many years.'" *Id.* ¶ 43. Dr. Hamilton conducted an examination and a "medicated interim restoration." *Id.*. Then, on December 7, 2012, Dr. Hamilton conducted a "medicated interim restoration of . . . tooth number 8" and gave Ojo amoxicillin and ibuprofen again for his "periapical abscess without sinus." *Id.* ¶ 44. On Ojo's next visit, on February 14, 2013, "Dr. Hamilton performed a root canal of tooth number 8" and gave him an antibiotic at the end of the visit. *Id.* ¶ 45. Ojo returned a week later, still complaining of tooth pain. *Id.* ¶ 46. Dr. Hamilton noted "bone loss, lateral radiolucency, tenderness, swelling, and pulpal necrosis associated with tooth number 9." *Id.* Dr. Hamilton provided initial treatment for this issue on March 7, 2013. *Id.* ¶ 47. Then, on May 9, 2013, Dr. Hamilton conducted a root canal of tooth number 9. *Id.* ¶ 48. Ojo then received further treatment from Dr. Hamilton, including routine care, over three visits between May 30 and October 24, 2013. *Id.* ¶¶ 49–51. During his May 30, 2013 visit, Ojo "reported '0' out of '10' with

respect to pain." *Id.* ¶ 49. In February 2014, Ojo visited Dr. Hamilton two more times; both times, she recommended extraction of tooth number 9, but he refused to have the tooth removed. *Id.* ¶¶ 52–53.

Ojo sent Dr. Hamilton and the dental department "approximately 18 emails, between March 17, 2013 and February 23, 2014," via the BOP's TRULINCS email system, complaining of tooth pain as a result of Dr. Hamilton's treatment on December 5, 2012. *Id.* ¶ 55. In one electronic message sent on October 29, 2013, however, Ojo thanked Dr. Hamilton "'for the good job you have started on my teeth. I want to say that I feel relief on the part of the teeth that you treated (the fillings) on my last visit.'" *Id.* ¶ 56. Ojo "did not send any electronic messages to [defendant] Warden Frank Strada regarding his dental treatment." *Id.* ¶ 57. Ojo sent one email to the Assistant Warden for Programs on December 29, 2013, defendant Shirley White, complaining of the dental treatment he received at MDC. *Id.* ¶ 58. Defendants note that Ojo sent this message to White the day before he signed the complaint in *Ojo v. Hamilton*, case no. 14-cv-298, a separate civil action he filed relating to the events of this case, *id.*, which I will discuss further below.

### B. Plaintiff's account of his dental care

Ojo's account of the course of the dental care he received at MDC is markedly different. As an initial matter, he states that upon his initial admission to MDC on July 11, 2011, he was subjected to a medical examination; he did not complain of any pain to his teeth and did not have any broken teeth. Pl.'s Decl. in Opp'n to Defs.' Mot. for Partial Summ. J. ¶ 12, ECF No. 75-1 ("Ojo Decl."); Pl.'s Statement of Disputed Facts ¶¶ 42–43, ECF No. 75-2 ("Pl.'s 56.1 Resp."). He began to experience tooth pain in early October 2011, and requested a dental visit. Ojo Decl. ¶ 15. Dr. Hamilton diagnosed him with "teeth infection, periapical abscess, and periodontal disease," but did not provide him with instructions on dental hygiene and only provided him with

five days' worth of medication. Ojo Decl. ¶¶ 16–17. His pain returned after the medication ran out, but Dr. Hamilton refused to give him any more medication. *Id.* ¶¶ 17–18. She told him to buy pain relief medication from the commissary, which he did. *Id.* ¶ 18–19. He continued to complain of tooth pain to Dr. Hamilton by submitting sick call slips and BP-148 forms. *Id.* ¶ 20.

Dr. Hamilton advised Ojo that she had to first "complete routine care" before she could provide him with the needed dental treatment. *Id.* ¶ 21. She told him to request routine care via a BP-148 form, which he did. *Id.* ¶ 22. Dr. Hamilton acknowledged receiving this form, but told Ojo that there was nothing she could do for him "until after the routine care" and that, as a matter of "policy," he had to wait 12 months to receive routine care. *Id.* ¶¶ 23, 25. Dr. Hamilton told him that this policy applied to pretrial detainees at MDC but that, once he was convicted "and moved to [a] permanent jail," there would be no 12-month waiting period for routine care. *Id.* ¶ 29.

While waiting for routine care, Ojo continued to complain of dental pain and submit dental sick call slips, but to no avail. *Id.* ¶ 24. He was forced to endure dental pain for 14 months, from October 13, 2011 to December 4, 2012, before receiving dental treatment. *Id.* ¶ 26. During this period, he suffered "severe pains as a result of [his] dental abscess, periodontal disease and infection." *Id.* ¶ 27. As a result of this pain and his resulting stress, he lost over 40 pounds. *Id.*

Ojo repeatedly filed complaints and grievances during this period, directing them to Dr. Hamilton, John Doe Medical Director, and Warden Strada, both verbally and by filling out BP-148 forms. *Id.* ¶ 28. (Between July 2011 and December 2012, the only way to ask staff for medical treatment was by direct oral communication, writing a letter, or by filling out a BP-148 form. *Id.* ¶ 30. Starting in 2013, MDC inmates began to be able to communicate with staff via the TRULINCS email system. *Id.* ¶ 31.) In addition to filling out BP-148 forms, Ojo complained to Warden Strada of his dental pain more than three times when Strada was making his rounds. *Id.*

¶ 32. He would also complain to Dr. Hamilton or the MDC medical director every Tuesday, when they visited the "Main Line," in person. *Id.* ¶ 33. Ojo was not aware of any way to directly contact Warden Strada using TRULINCS, but he "communicated complaints of [his] dental pain to virtually" everyone with a "medical, dental and/or supervisory role on the TRULINCS" email system. *Id.* ¶ 39.

On December 4, 2012, Ojo was finally brought to the dental clinic. *Id.* ¶ 40. Dr. Hamilton drilled his tooth but did not provide him with any medication. *Id.* As a result of this treatment, his teeth, gum, and mouth became swollen and he suffered severe pains, which interfered with his ability to sleep. *Id.* ¶ 41. Ojo requested emergency dental care the next day, and then the day after that, but he was not brought back to the dental clinic until he passed out on the afternoon of December 7. *Id.*

During his initial period of dental pain from 2011 to 2012, Ojo did not know Assistant Warden White. *Id.* ¶ 43. He began to complain to her of his dental pain after she visited his dormitory unit in the middle of 2013. *Id.* He complained to her personally of his dental pains on more than three occasions. *Id.* ¶ 44; *see also* Pl.'s 56.1 Resp. ¶ 58. On one of those occasions, she told him that he could contact her via TRULINCS by sending emails to the "AW Program" account. Ojo Decl. ¶ 44. He then sent "AW Program" more than three emails via TRULINCS complaining of his dental pain. *Id.* ¶ 45. Ojo has provided a sampling of these emails, written between September 22, 2013, and February 23, 2014; most of them are addressed to the dental department, but one—dated December 29, 2013—is also addressed to "AW Programs." *Id.* ¶ 46.[2]

---

[2] Ojo claims that the email he sent to "AW Programs" that begins with the phrase "I seize this opportunity to forward this request (one of many written previously) to you" is proof that he "had communicated many complaints previously to her." Ojo Decl. ¶ 48. But the import of this phrase is only that he had previously made many complaints, not that he had communicated them to White.

Ojo states that these "are just [a] few excerpts out of [a] long list of . . . dental pain complaints that I communicated via TRULINCS to the MDC staff[]." *Id.* Yet, despite the fact that he repeatedly made complaints to various supervisory staff, Dr. Hamilton stated at her deposition that "none of her supervisor[s] discuss[ed] [his] dental pain[] issue[s] with her." *Id.* ¶ 51.

Ojo does not dispute the details of the dental care he received starting on December 4, 2012. But his expert witness, Jay Grossman, D.D.S., testified at a deposition about the inadequacy of this treatment. According to Dr. Grossman, the root canals performed by Dr. Hamilton in 2013 constituted inadequate treatment given the amount of bone loss Ojo had suffered. Pl.'s 56.1 Resp. ¶¶ 45–47. Dr. Grossman testified that, given the amount of bone loss that Ojo had suffered while awaiting dental care, treatment adequate to alleviate his dental pain would have required extracting his teeth. *Id.* ¶ 49. Moreover, the routine care provided by Dr. Hamilton after the root canals "was not adequate to stop [Ojo's] dental pain at that stage." *Id.* ¶ 51.

Ojo also disputes the reasons for his refusal to allow his teeth to be extracted in February 2014. He states that he refused the first extraction because Dr. Hamilton had told him that BOP would never provide him with dentures. *Id.* ¶ 52. He then "changed his mind within seconds after the refusal while [he] was still sitting on the dental chair[,] but Dr. Hamilton insisted that she [would] not do the extraction . . . and called for an escort to move [him] out of the clinic." *Id.* Ojo refused to have his tooth extracted the second time because he had a court date the next day and did not "want the extraction to hinder his freedom from incarceration." *Id.* ¶ 53. Also, he asserts that Dr. Hamilton had agreed to schedule Ojo for another visit after his court date. *Id.*

## C. Procedural history

On January 6, 2014, while Ojo was still incarcerated at MDC, he filed a lawsuit against Dr. Hamilton in this court under docket number 14-cv-298, raising essentially the same factual claims

he raises here. He alleged that Dr. Hamilton "has been deliberately indifferent to my tooth pain which has resulted [in] infection on my teeth and therefore subjected me to unnecessary and unwanted severe pain." Compl. 4, 14-cv-298, ECF No. 1. After the defendants expressed their intent to file a summary judgment motion in that case, Magistrate Judge Bloom held a telephone conference during which she informed Ojo that because Dr. Hamilton worked for the Public Health Service he could only sue her under the FTCA and that, in order to do so, he was required to first file an administrative claim. Ojo Decl. Ex. B 3–4, Tr. of May 1, 2014 Telephone Conference in 14-cv-298, ECF No. 75-6. Ojo filed the requisite administrative claim and subsequently voluntarily dismissed his suit against Dr. Hamilton on October 20, 2015. Ojo Decl. ¶ 58; *see also* Notice of Voluntary Dismissal, 14-cv-298, ECF No. 38.

On the same day that he dismissed his suit against Dr. Hamilton, Ojo filed the present case. *See* Compl., ECF No. 1. Ojo subsequently filed an amended complaint on June 6, 2016. Am. Compl., ECF No. 23. The defendants moved to dismiss this amended complaint. I granted the motion to dismiss as to Ojo's *Bivens* claims against defendants Strada and White in their official (as opposed to individual) capacities, but denied the remainder of defendants' motion "without prejudice to renewal following discovery." Op. & Order 2, ECF No. 30.

Following the close of discovery, the defendants moved for summary judgment on all but one claim, which they described as "the core of plaintiff's case—the claim that he received negligent dental health care at MDC." Mem. of Law in Supp. of Defs.' Mot. for Partial Summ. J. 1, ECF No. 59 ("Defs.' Mem. of Law"). After the defendants filed their motion, Ojo was arrested by Immigration and Customs Enforcement and placed in immigration detention, where he is presently being held pending immigration proceedings. *See* Letter from Olukayode David Ojo (April 23, 2018), ECF No. 67; Letter from Olukayode David Ojo (May 21, 2018), ECF No. 69.

After being granted several extensions of time, he responded to the defendants' motion. *See* Pl.'s Br. in Opp'n to Defs.' Mot. for Partial Summ. J., ECF No. 75 ("Pl.'s Br.").

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact" and that she "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In performing this analysis, I must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). "If, in this generous light, a material issue is found to exist, summary judgment is improper, and the case must proceed to trial." *Nationwide Life Ins. Co v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985)). In addition, in determining whether to grant summary judgment, I must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

### I. The defendants' motion for summary judgment on Ojo's claims for negligent hiring, retention, and supervision is granted.

Ojo's first cause of action alleges negligent hiring and retention under the FTCA, and his second cause of action alleges negligent supervision under the FTCA. *See* Am. Compl. ¶¶ 137–57. Defendants argue that these claims fail because Ojo "cannot establish any facts from which to infer that the United States knew or should have known that Dr. Hamilton . . . or for that matter, any other BOP employee . . . , would engage in [the] conduct that allegedly caused Plaintiff's

dental injury." Defs.' Mem. of Law 20. Specifically, defendants argue, Ojo "cannot show that Dr. Hamilton had a history of misconduct that could have enabled the United States to become aware of such conduct." *Id.* In response, Ojo argues that the United States was on notice of Dr. Hamilton's negligence because it had been "sued on more than one occasion as a result of her conduct." Pl.'s Br. 8. In support, he provides records of three suits against Dr. Hamilton by inmates at MDC—including his own suit against her under 14-cv-298. Ojo Decl. Ex. D, ECF No. 75-8. Defendants reply that, although Dr. Hamilton may have been sued three times, "none of these public filing[s] indicate any of the allegations made in these prior lawsuits were *sustained* or that Dr. Hamilton had ever done anything improper." Reply Mem. of Law in Supp. of Defs.' Mot. for Partial Summ. J. 9, ECF No. 75 ("Defs.' Reply"). The defendants have the better of the argument.[3]

Although Ojo pleads this as two separate causes of action, the elements of negligent hiring, retention, and supervision are materially identical under New York law. *See, e.g., Doe v. Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y. 2014); *Gonzalez v. City of New York*, 17 N.Y.S.3d 12, 15 (N.Y. App. Div. 2015); *Shor v. Touch-N-Go Farms, Inc.* 933 N.Y.S.2d 686, 688 (N.Y. App. Div. 2011). To state a claim for this tort, "in addition to the standard elements of negligence, a plaintiff must show:"

1) that the tort-feasor and the defendant were in an employee-employer relationship;

2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and

---

[3] The defendants also argue that they should be granted summary judgment on Ojo's negligent-training claim. Defs.' Mem. of Law 21. I do not read Ojo's complaint as raising an allegation of negligent training. Nevertheless, in an abundance of caution, I note that I agree that Ojo cannot raise a negligent training claim at trial because he has not adduced any evidence "demonstrat[ing] deficiencies in the training of employees that, if corrected, could have avoided the alleged harm." *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 225 (E.D.N.Y. 2010) (quoting *Carter v. Port Auth. of N.Y. & N.J.*, 03 Civ. 8751 (DLC), 2004 WL 2978282, at * 5 (S.D.N.Y. Dec. 20, 2004)).

3) that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations omitted).

As Dr. Hamilton was undisputedly an employee of the United States and the injury to Ojo occurred at MDC, the only issue in dispute is whether the government knew or should have known of her propensity to provide negligent dental care prior to the events of this case.

While Ojo's own prior lawsuit against Dr. Hamilton about the conduct underlying this suit could not have put the defendants on notice, as it did not precede his injuries, the other lawsuits in which Dr. Hamilton is named as a defendant were filed prior to the events of this case. In one suit, filed in 2008, the plaintiff alleged that the defendants, including Dr. Hamilton, "were all clearly aware of my tooth infection and did not respond in a timely manner. It took 16 months to remove one tooth" despite it twice becoming infected in the interim. Ojo Decl. Ex. D, *Geralds v. Patel*, 08-cv-104, Compl. 4. In another case, filed in 2010, the plaintiff alleged that Dr. Hamilton severed his right lower molar bone mount while extracting his molar, causing him "excruciating pain," but did not inform him that she had done so. Ojo Decl. Ex. D, *Calmes v. Hamilton*, 10-cv-1173, Compl. 4. This injury later required reconstructive surgery by a private dentist. *Id.* at 5.

As the defendants argue, the allegations in these other complaints are not proof of Dr. Hamilton's prior negligence. Indeed, far from being proven at trial, the claims against Dr. Hamilton were dismissed in both cases, apparently based on her absolute immunity from suit as an employee of the Public Health System. *See* Min. Order, *Calmes v. Hamilton*, 10-cv-1173, ECF No. 37 (granting motion to dismiss); Mem. & Order, *Geralds v. Patel*, 08-cv-104, ECF No. 55 (granting motion to dismiss claims against Dr. Hamilton on the basis of absolute immunity). Even construing the evidence in the light most favorable to the plaintiff and drawing all inferences in his favor, such unsubstantiated allegations were insufficient to put the defendants on notice of

Dr. Hamilton's purported propensity to provide negligent dental care. *Cf. Law v. Cullen*, 613 F. Supp. 259, 262 (S.D.N.Y. 1985) (holding that several unsubstantiated CCRB complaints for excessive force against a police officer did not provide a basis for plaintiff's claim that this officer "had a 'propensity' to use excessive force and, hence, [there was] no basis for [plaintiff's] claim that the City was deliberately indifferent to such a propensity" because "the CCRB complaints are merely charges"). The defendants' motion for summary judgment on this claim is therefore granted.

## II. The defendants are granted summary judgment on the FTCA claims alleging an unconstitutional policy as there is no private-law analogue to these claims.

Ojo's third and fourth causes of actions allege the "negligent establishment of [an] unconstitutional policy for [the] provision of dental care to pretrial detainee[s]" and the "negligent application of [a] policy for [the] provision of dental care to pretrial detainee[s]" under the FTCA. *See* Am. Compl. ¶¶ 158–79. Both of these claims fail for the same reason.

The FTCA waives the United States Government's sovereign immunity for claims where a private actor would be liable under the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Thus, "for liability to arise under the FTCA, a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred." *McGowan v. United States*, 825 F.3d 118, 125 (2d Cir. 2016) (quoting *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988)). New York law does not allow for civil actions against private actors for the creation or application of an unconstitutional policy. Indeed, although Ojo argues in a section heading of his response brief that these claims do "not lack [a] private analogue," the only authority he provides in support is a case dealing with the supervisory liability of prison officials under the Eighth Amendment. *See* Pl.'s Br. 8 (citing *Richardson v. Goord*,

347 F.3d 431, 435 (2d Cir. 2003)). This illustrates the point—such a claim could be brought against a state official under § 1983, but it cannot be brought against a private citizen under state law.

### III. The defendants are granted summary judgment on Ojo's claims for negligent infliction of emotional distress and intentional infliction of emotional distress.

Ojo's sixth, seventh, and eleventh causes of action, respectively, are for negligent infliction of emotional distress under the FTCA, intentional infliction of emotional distress under the FTCA, and intentional infliction of emotional distress under *Bivens*. *See* Am. Compl. ¶¶ 191–212, 252–62. These causes of action all fail because such claims cannot be brought "where other tort remedies are available." *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002). No negligent infliction of emotional distress or intentional infliction of emotional distress claim will lie where "the conduct underlying the claim[s] falls within the ambit of traditional tort liability." *Romero v. City of New York*, 839 F. Supp. 2d 588, 632 (E.D.N.Y. 2012); *Deronette v. City of New York*, No. 05 CV 5275 (SJ), 2007 WL 951925, at *5 (E.D.N.Y. Mar. 27, 2007); *DeVito v. Barrant*, No. 03-CV-1927 DLI RLM, 2005 WL 2033722, at *9 (E.D.N.Y. Aug. 23, 2005). But, here, the conduct underlying plaintiff's claim—inadequate dental care—is actionable under a theory of negligence. In fact, the defendants are not even moving for summary judgment on Ojo's negligence claim.

Each of these three causes of action also fails for another, independent reason.

A negligent infliction of emotional distress claim requires that either (1) the defendant breached a duty owed to the plaintiff and that this breach resulted in emotional harm but no physical danger; (2) the defendant negligently created an unreasonable risk of physical harm to the plaintiff and such conduct led to the serious injury or death of a member of the plaintiff's family in his or her presence; or (3) "a third party [was] physically injured through the violation of some

duty which causes only financial or emotional harm to the plaintiff." *Taggart v. Costabile*, 14 N.Y.S. 3d 388, 395–96 (N.Y. App. Div. 2015) (collecting cases). This case does not fall into any of those categories. Thus, Ojo cannot make out a negligent infliction of emotional distress claim.

The defendants' actions also do not rise to the level of "extreme and outrageous" conduct necessary for an intentional infliction of emotional distress claim. *See Chanko v. Am. Broad. Cos.*, 49 N.E.3d 1171, 1178 (N.Y. 2016) (quoting *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 1178 (quoting *Howell*, 612 N.E.2d at 702). Failure to provide proper dental care does not meet this standard.

Finally, Ojo's intentional infliction of emotional distress *Bivens* claim fails because such a claim is not a constitutional claim that gives rise to liability under *Bivens*. "A [p]laintiff bringing a claim under *Bivens* must allege that he has been deprived of a constitutional right by a federal agent acting under color of federal authority." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006). But intentional infliction of emotional distress is not a constitutional claim; instead, it is a state-law tort claim. *See, e.g.*, *Boyce v. New York City Mission Soc.*, 963 F. Supp. 290, 297 (S.D.N.Y. 1997).

### IV. The defendants' motion for summary judgment on Ojo's *Bivens* claim(s) for deliberate indifference to a serious medical need is granted.

Ojo's eighth, ninth, and tenth causes of action involve different theories of liability but essentially a single claim—that the defendants were deliberately indifferent to his serious need for

dental care in violation of the Fifth and Eighth Amendments to the United States Constitution.[4] I will therefore analyze these three causes of action together.

### A. Ojo was not required to exhaust his administrative remedies because he was no longer in custody at the time that he filed this complaint.

The defendants first argue that they should be granted summary judgment on Ojo's *Bivens* claims because he was required to exhaust his administrative remedies before filing suit. Defs.' Mem. of Law 8–12. This argument is meritless. Plaintiff was released from BOP custody on March 14, 2014, Defs.' 56.1 Statement ¶ 6, and did not file this lawsuit until over a year later, Compl., ECF No. 1. The requirement of exhaustion of administrative remedies before filing suit applies only to individuals who were in custody at the time that they filed their lawsuit. The Prison Litigation Reform Act (PLRA) states, "No action shall be brought with respect to prison conditions . . . *by a prisoner confined in any jail, prison, or other correctional facility* until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). And, the Second Circuit has held that "litigants . . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision." *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999). Thus, Ojo's purported failure to exhaust his administrative remedies before filing suit does not bar this action.

---

[4] The eighth cause of action alleges the "violation of due process rights under the Fifth Amendment against Strada, White and John Doe # 1" based on the "insufficient, improper and in some cases, [lack of] dental treatment at the MDC facility." Am. Compl. ¶ 213–224. The ninth cause of action alleges "inadequate dental treatment under the Fifth, Eight, and Fourteenth Amendment against Strada, White and John Doe # 1," stating that the defendants violated Ojo's "right to adequate medical care . . . by failing to treat [his] known serious medical condition." *Id.* ¶¶ 225–37. The tenth cause of action alleges "failure to intervene under the Fifth and Fourteenth Amendment against Strada, White and John Doe # 1" because the defendants "knowingly and wil[l]fully ignored and/or failed to act on [Ojo's] known serious dental/medical condition without a rational basis." *Id.* ¶¶ 238–251.

Defendants nonetheless contend that "[p]laintiff's claims cannot be saved by virtue of the fact that he filed the instant action after being released from custody." Defs.' Mem. of Law 12. Yet the only authority they cite in support of this proposition are cases where the plaintiff was incarcerated *at the time* that he filed his complaint, although he was later released or transferred to state custody. *See Parrott v. Gehrke,* 103 F. App'x 908, 910 (7th Cir. 2004); *Maree-Bey v. Nash*, 53 F. App'x 240, 241 (4th Cir. 2002); *Covell v. Scibana*, 21 F. App'x 291, 293 (6th Cir. 2001). Accordingly, these cases do not support defendants' argument that the PLRA's exhaustion requirement applies to individuals who were released from federal custody *before* filing suit. Defendants' citation to the fact that the applicable regulations allow former inmates to file administrative grievances is equally unpersuasive. Defs.' Mem. of Law 12 (citing 28 C.F.R. § 542.10(a), (c)). It is of no moment that a former inmate *can* pursue administrative grievances about prison conditions even after being released from BOP custody; the point is that he is not *required* to do so before filing suit.

Finally, the defendants argue that because Ojo filed his initial complaint in *Ojo v. Hamilton* while he was still in BOP custody, "[h]e cannot use the voluntary dismissal of that case and the commencement of a new one to make an end-run around the PLRA." *Id.*; *see also* Defs.' Reply 3 n. 3. But defendants cite no authority for the proposition that an individual who is no longer in custody is required to exhaust administrative remedies simply because he had previously filed a separate but related suit against a different defendant while he was incarcerated. Nor am I aware of any such authority.[5] Rather, the plain language of the PLRA dictates that "[n]o action shall be

---

[5] In fact, contrary to defendants' argument, federal courts have found that the PLRA's exhaustion requirement does not apply when a plaintiff files suit while incarcerated but later amends the complaint after release, because "[e]xhaustion requirements apply based on when a plaintiff files the operative complaint." *Jackson v. Fong,* 870 F.3d 928, 935 (9th Cir. 2017); *accord Rhodes v. Robinson*, 621 F.3d 1002, 1005–07 (9th Cir. 2010); *see also Barnes v. Briley*, 420 F.3d 673, 678 (7th Cir. 2005) (holding that prisoner could add § 1983 claims to his amended complaint because he properly exhausted his administrative remedies for these claims after initially filing suit, but before amending his complaint,

brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because Ojo was no longer a "prisoner" when he brought *this* action, he was not required by the PLRA to exhaust available administrative remedies before filing suit.

### B. The defendants are entitled to qualified immunity because there is no clearly established law as to whether their conduct constituted personal involvement.

Defendants next argue that summary judgment should be granted on the *Bivens* claims because there is no evidence that they had the personal involvement in a constitutional violation required for *Bivens* liability. Defs.' Mem. of Law 12–16; Defs.' Reply 4–7. This argument succeeds since plaintiff's evidence, at most, shows that the individual defendants knew of Ojo's need for dental care, but not that they acted with any purpose or intent to deny him treatment. In light of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), it is unclear whether merely being advised of an issue by an appeal and failing to remedy it constitutes the requisite personal involvement for *Bivens* liability.

In *Iqbal*, in addition to clarifying pleading standards, the Supreme Court expounded on what is necessary to show the personal involvement of supervisory defendants for a *Bivens* action. The Court rejected plaintiff's argument that a supervisor's "knowledge and acquiescence" in her subordinate's unconstitutional conduct was sufficient for supervisory liability. *Id.* at 677. Instead, the Court held that, under *Bivens*, "[a]bsent vicarious liability, each Government official . . . is only liable for his or her own misconduct." *Id.* In other words, "purpose rather than knowledge is required to impose *Bivens* liability . . . for an official charged with violations arising from his or her

---

and "[t]he filing of the amended complaint was the functional equivalent of filing a new complaint"); *Martinez v. Guadalupe County*, 200 F. Supp. 3d 1216, 1259–60 (D.N.M. 2016) (holding that prisoner was required to exhaust claims, although he was not incarcerated at the time that he filed his initial complaint, because he was incarcerated at the time that he filed his amended complaint and it was his "status when he filed the FAC . . . that determines whether the PLRA's exhaustion applies.").

superintendent responsibilities." *Id.* But the opinion leaves unclear whether this analysis applies to all *Bivens* actions, or only those where "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 676. As the Court noted, "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.*

*Iqbal* implicitly abrogated, at least in part, the test for supervisory liability the Second Circuit articulated in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). While *Colon* allowed for five types of personal involvement by supervisory defendants in § 1983 (and thus *Bivens*) actions, *Iqbal* put the "continuing vitality of [*Colon's*] supervisory liability test" in question. *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012). Although the Second Circuit has yet to resolve this issue, *see id.*, district courts in this circuit have found that some of *Colon's* categories of supervisory liability do not survive *Iqbal*. *See, e.g.*, *Butler v. Suffolk County*, 289 F.R.D. 80, 94 n.8 (E.D.N.Y. 2013) ("[T]he weight of authority among the district courts in the Eastern District of New York suggests that only two of the *Colon* factors—direct participation and the creation of a policy or custom—survive *Iqbal*."); *Firestone v. Berrios*, 42 F. Supp. 3d 403, 415 (E.D.N.Y. 2013) ("*Iqbal* abrogated many prongs of the *Colon* test."). *Warrender v. United States*, No. 09-CV-2697 (KAM) (LB), 2011 WL 703927, at *5 n.1 (E.D.N.Y. Feb. 17, 2011) ("[M]ost of the *Colon* categories have been superseded by *Iqbal*.").

Nonetheless, there is a certain degree of "conflict" among district courts about exactly how *Iqbal* affects *Colon*. *Reynolds*, 685 F.3d at 205 n.14 (citing *Aguilar v. Immigration & Customs Enf't Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 814 (S.D.N.Y. 2011)). Specifically, some courts "have questioned whether *Iqbal* changed the standard of supervisory liability outside of the equal protection context." *Aguilar*, 811 F. Supp.2d at 815. One court concluded, for example, that "[w]here the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth

Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009); *see also, e.g., Aponte v. Fischer*, No. 14-CV-3989 (KMK), 2018 WL 1136614, at *8 n.5 (S.D.N.Y. Feb. 28, 2018) ("[A]ll five categories under *Colon* are still valid unless and until the Second Circuit holds otherwise." (citation omitted)).

*Colon*'s second category of supervisory liability—where a supervisory defendant, "after being informed of the violation through a report or appeal, failed to remedy the wrong," 58 F.3d at 873—is at issue here. Only if *Colon* remains good law with respect to cases involving deliberate indifference claims (such as this one) can the individual defendants be found to have the requisite personal involvement for a *Bivens* claim. *Iqbal* stated that "knowledge and acquiescence" was insufficient to support supervisory liability, at least with regard to claims requiring a showing of discriminatory purpose. 556 U.S. at 677. Thus, assuming that *Iqbal*'s test for supervisory liability— and not that of *Colon*—applies to cases such as this one, *Bivens* defendants cannot be held liable simply because they were informed of a constitutional violation but failed to remedy this wrong. The only personal involvement that Ojo alleges any of the individual defendants had in this case is exactly that—he repeatedly complained to these officials of Dr. Hamilton's failure to treat his dental needs properly, but they did nothing in response. *See* Pl.'s Br. 4–5. There is therefore a strong argument that, after *Iqbal*, plaintiff's evidence can no longer support a *Bivens* claim.[6]

Ultimately, however, I need not resolve the question of whether *Iqbal* abrogated *Colon* in cases involving claims of deliberate indifference such as this one. This is because, regardless of

---

[6] The defendants first raised an argument that *Iqbal* superseded *Colon* in respects relevant to this case in a footnote of their reply brief. *See* Defs.' Reply 5 n.4. "Arguments made for the first time in a reply brief need not be considered by a court." *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) (collecting cases). Nonetheless, I have the discretion to consider arguments first raised on reply. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005). I have chosen to do so here because the defendants did raise in their opening brief the overarching, related argument that they were not liable because they were not personally involved in a constitutional violation.

whether *Colon*'s second category of supervisory liability survived *Iqbal* in such cases, the defendants are entitled to qualified immunity based on the very uncertainty of the governing law. Defendants "are entitled to qualified immunity" if their conduct "did not violate clearly established law." *Pearson v. Callahan*, 555 U.S. 223, 243 (2009). "[C]onduct violates clearly established law when . . . existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In cases where a supervisor is being sued for a constitutional violation committed by a subordinate, this requires both that the underlying right is clearly established and that the "supervisory liability doctrine under which [the plaintiff] wishes to hold [the supervisory defendant] liable" is clearly established. *Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002). But, here, there is room for ample debate as to whether, after *Iqbal*, the defendants' failure to respond to Ojo's complaints about inadequate dental care constituted sufficient personal involvement to be subject to *Bivens* liability. "The Court of Appeals has not yet definitively decided which of the *Colon* factors remains a basis for establishing supervisory liability in the wake of *Iqbal,* and no clear consensus has emerged among the district courts within the circuit." *Aguilar*, 811 F. Supp. 2d at 814. In fact, the Second Circuit has explicitly noted its "considerable skepticism" about whether *Colon*'s five-part test for supervisory liability remains good law in light of *Iqbal*. *Reynolds*, 685 F.3d at 205 n.14; *see also Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test . . . after *Iqbal*.").

Accordingly, I grant the defendants' motion for summary judgment on Ojo's eighth, ninth, and tenth causes of action—his claim that the defendants were deliberately indifferent to his serious need for dental care in violation of the Fifth Amendment to the United States Constitution. The defendants are entitled to qualified immunity because they did not violate clearly established law.

### V. Defendants' motion for summary judgment on Ojo's equal protection claim is denied because the defendants have not shown that they are entitled to judgment as a matter of law.

Ojo's twelfth and final cause of action is an equal protection claim brought under *Bivens*, alleging that he had to wait over a year for necessary dental care that a sentenced prisoner would have received more quickly. *See* Am. Compl. ¶¶ 263–272. Defendants analyze this as a "class-of-one" equal protection claim pursuant to *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), and argue that this claim fails because Ojo was not "treated differently than similarly situated persons due to any impermissible reason." Defs.' Mem. of Law 19. They assert that he cannot show that he was treated differently from similarly situated persons since pretrial detainees are not similarly situated to sentenced prisoners. Defs.' Reply 8-9 (citing to two district court decisions from other circuits).

If I interpreted Ojo's complaint as bringing a class-of-one-claim, the government would likely be correct. A successful class-of-one claim requires a plaintiff to "allege[] that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. This requires "[c]lass-of-one plaintiffs [to] show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006)). Indeed, a plaintiff must establish, among other things, that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Id.* at 60 (quoting *Clubside, Inc.*, 468 F.3d at 159).

I need not reach this question, however, as I find that—construed liberally—Ojo's complaint alleges a different kind of equal protection claim. Ojo alleges that he had to wait years

for dental care—during which time he suffered great pain and his teeth deteriorated—as a result of a policy of timely treating the dental needs of convicted prisoners but not the needs of pretrial detainees at MDC, and that such a policy is without a rational basis. The allegations of the complaint state that the defendants "acted in violation of the Equal Protection Clause . . . by discriminating against [plaintiff] based on his pretrial status with no rational basis to do so." Am. Compl. ¶ 266. Specifically, they "failed to approve a simple and inexpensive diagnostic and treatment procedure . . . because he was a pretrial detainee, while having a policy to provide this type of care to other federal prisoners who were not in the same class as plaintiff." *Id.*; *see also* Pl.'s Br. 7 ("The allegations in [Ojo's] affidavit portray a . . . denial of serious dental care to Plaintiff because [he] was a pretrial inmate and not an inmate that was serving [a] sentence at MDC.").

"The demands of equal protection of the laws . . . prevent unjustifiable confinement of [pretrial] detainees under worse conditions than convicted prisoners." *Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974). Indeed, "equal protection requires that 'pretrial detainees not be treated less favorably than convicted persons, unless the difference in treatment is justified by a legitimate government interest.'" *Parkell v. Morgan*, 682 F. App'x 155, 159 (3d Cir. 2017) (quoting *Lock v. Jenkins*, 641 F.2d 488, 497 (7th Cir. 1981)). Ojo is alleging just that—that he was treated less favorably than convicted prisoners because of his pretrial status—and he has adduced some, albeit scant, evidence to show the existence of a policy of not timely treating the dental care needs of pretrial detainees. Specifically, he provides as evidence his 14 months' wait for dental care and Dr. Hamilton's alleged statement to him that, "as a policy, [he had] to wait for 12 months for [his] name to be included on the list of those that will receive routine care." Ojo Decl. ¶ 25.

I cannot grant the defendants summary judgment on this claim because they have not "show[n] that there is no genuine dispute as to any material fact" and that they are "entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The defendants do not even dispute the existence of the purported policy of making pretrial detainees but not sentenced prisoners wait over a year for dental care at MDC, let alone have they shown by undisputed evidence that no such policy exists. The defendants also do not provide any evidence—unrebutted or otherwise—that such a policy is justified by a legitimate penological interest. Nor have the defendants shown that there is no issue of disputed fact as to their lack of personal involvement in any constitutional violation.[7]

Because the defendants have not shown that they are entitled to judgment as a matter of law on plaintiff's equal protection *Bivens* claim, their motion for summary judgment on this claim is denied without prejudice to its renewal on alternate grounds.[8]

## CONCLUSION

For the foregoing reasons, the defendants' motion for partial summary judgment is granted in part and denied in part. Plaintiff's FTCA claim for negligent dental care and equal protection *Bivens* claim survive; the defendants are granted summary judgment on all other claims.

---

[7] Although the defendants argue that "the *Bivens* [d]efendants ha[d] no personal involvement in any conduct rising to the level of a constitutional violation," Defs.' Mem. of Law 12, their only specific argument is that none of the defendants were personally involved "in the alleged inadequate dental treatment," *id.* at 14. Yet, even after *Iqbal*, supervisors can be held liable under *Bivens* for "creat[ing] a policy or custom under which unconstitutional practices occurred." *Colon*, 58 F.3d at 873; *see, e.g.*, *Butler*, 289 F.R.D. at 94 n.8 (recognizing that *Iqbal* did not abrogate this particular "*Colon* factor"). Thus, the defendants must show that there is no genuine dispute of fact that they did not create the purported policy to be granted summary judgment based on their lack of personal involvement.

[8] Defendants also argue for the first time in a footnote in their reply brief that there is "no *Bivens* remedy" for equal protection violations under *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Defs.' Reply 8 n. 6. In this instance, I choose to exercise my discretion to not consider an argument "raised for the first time in a footnote in [a] reply brief," *Kuhns v. Ledger*, 202 F. Supp. 3d 433, 439 n.2 (S.D.N.Y. 2016) (citing *Playboy Enters., Inc.*, 960 F. Supp. at 720 n.7), given that this issue involves complex questions of law and the defendants did not raise the issue in their opening brief.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:      August 14, 2018
            Brooklyn, New York