UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Olukayode David Ojo,<br><br>          Plaintiff<br><br>— against —<br><br>United States of America, Warden Frank Strada, Assistant Warden White, and John Doe 1 (Medical Director),<br><br>          Defendants. | **15-cv-6089 (ARR) (LB)**<br><br><br><br><br>**Opinion & Order** |

ROSS, United States District Judge:

While he was in the custody of the Federal Bureau of Prisons ("BOP") as a pretrial detainee, *pro se* plaintiff, Olukayode David Ojo, was diagnosed with a dental condition caused by a decayed and broken tooth. It was not until December 2012, nearly fourteen months after his initial diagnosis, that he received a follow-up appointment with a dentist at the Metropolitan Detention Center ("MDC"). He alleges that the gap in his treatment was caused by an unconstitutional BOP policy of denying necessary dental care to pretrial detainees. He initiated this lawsuit in October 2015 against the United States and various officials at MDC (collectively, "defendants"), alleging inadequate and negligent dental care resulting in severe bone loss and extensive damage to his two front teeth.

In August 2018, the court granted partial summary judgment to defendants on all but two of the claims in plaintiff's amended complaint. Defendants now bring a renewed motion for summary judgment with respect to plaintiff's sole remaining *Bivens* claim, arguing that the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), demonstrates that the law does not provide a cause of action for plaintiff to obtain the remedy he seeks. Because I conclude that there are special factors in this case that caution against implying a damages remedy

outside of the three established *Bivens* contexts, defendants' motion is granted.

## BACKGROUND

Plaintiff entered into the custody of BOP on July 11, 2011.[1] *See* Defs.' Suppl. 56.1 Statement ¶ 1, ECF No. 84. On August 8, 2013, following a jury trial, he was convicted of one count of conspiracy to commit wire fraud and one count of conspiracy to possess with intent to unlawfully use five or more identification documents. *See* Pl.'s Opp'n, Ex. A, ECF No. 90; Defs.' 56.1 Statement ¶ 4, ECF No. 60. He was sentenced to 37 months of incarceration on February 17, 2014, and was released from BOP custody on March 14, 2014. Defs.' 56.1 Statement ¶¶ 5–6.

### A. Plaintiff's Dental Treatment

On October 13, 2011, soon after his arrival at MDC, plaintiff made a sick call visit to Pamela Hamilton, D.D.S., a Public Health Service dentist at BOP. *Id.* ¶ 42. He complained of severe tooth pain and was diagnosed with a "periapical abscess without sinus," a condition for which he was prescribed amoxicillin and ibuprofen. *Id.* From October 13, 2011 through December 4, 2012, plaintiff continued to experience dental pain, which led to stress and weight loss. *See* Ojo Decl. in Opp'n to Defs.' Mot. for Summary J. ¶¶ 26–27, ECF No. 75-1. He alleges that he repeatedly raised the issue of his pain and discomfort in person and in written grievance and complaint forms directed to Dr. Hamilton, John Doe Medical Director, and Warden Strada. *Id.* ¶¶ 28, 32–33. Despite his persistent complaints, he was denied follow-up treatment and was informed

---

[1] I assume familiarity with the facts underlying this case, which are set forth in detail in my previous order granting in part defendants' motion for summary judgment. *See Ojo v. United States*, No. 15-cv-6089 (ARR) (LB), 2018 WL 3863441 (E.D.N.Y. Aug. 14, 2018). Accordingly, I cite only those facts which are relevant to the instant motion. Most of these facts are drawn from the parties' materials submitted in connection with the instant renewed motion for summary judgment, but, where necessary, I also draw from the parties' materials filed in connection with the prior motion for partial summary judgment. *See* Defs.' Br. 3, ECF No. 83 (directing the court to the 56.1 statement "submitted with [defendants'] original motion for partial summary judgment" for a more comprehensive summary of the material facts).

by Dr. Hamilton that, "as a policy, [he would] have to wait for 12 months for [his] name to be included on the list of those that will receive routine care." *Id.* ¶ 25; *see also id.* ¶ 29.

On December 4, 2012, plaintiff met with Dr. Hamilton for a second dental appointment, fourteen months after his first visit and diagnosis. Defs.' 56.1 Statement ¶ 43. She conducted an examination and completed a "medicated interim restoration." *Id.* During the remainder of his incarceration at MDC, plaintiff visited Dr. Hamilton several more times for continued dental treatment, including two visits in which Dr. Hamilton performed a root canal of plaintiff's two front teeth. *Id.* ¶¶ 44–51. Plaintiff alleges that the treatment he received was inadequate, as he continued to suffer severe pain and experienced significant bone loss. *See* Pl.'s 56.1 Resp. ¶¶ 45, 48–51, ECF No. 75-2. According to plaintiff's expert witness, Jay Grossman, D.D.S., the fourteen-month delay in the dental treatment plaintiff received at MDC contributed to "the eventual loss of [his] teeth." *See* Pl.'s Opp'n Ex. A, 58:6–10, ECF No. 75-5 ("Grossman Dep.").[2]

**B. BOP's Dental Care Policies**

During the time that plaintiff was incarcerated at MDC, BOP's dental care policy was set forth in Program Statement 6400.02, dated January 15, 2005. *See* Defs.' Suppl. 56.1 Statement ¶ 3; Castiglione Aff., Ex. A ("BOP Policy"), ECF No. 85-1. The BOP Policy began by declaring that its "purpose and scope" was "[t]o stabilize and maintain the inmate population's oral health" by providing "conservative" dental care, balancing the provision of "necessary treatment" with

---

[2] It does not appear from the record that plaintiff's two front teeth have actually been removed from his mouth; instead, Dr. Grossman acknowledged that by mentioning the loss of plaintiff's two front teeth, he was referring to "the condition whereby extraction of those two teeth are necessary." Grossman Dep. 58:11–16. In February 2014, before plaintiff was released from BOP custody, Dr. Hamilton recommended extraction of one of plaintiff's teeth, tooth number 9, but plaintiff refused the procedure. *See* Defs.' 56.1 Statement ¶ 53. According to Dr. Grossman, plaintiff's two front teeth are no longer functional and "can't be saved." Grossman Dep. 82:22–83:2; *see also id.* 60:19–61:5 (testifying that Ojo's bone loss necessitates "the extraction of his two front teeth").

"available resources." BOP Policy at US00532. Its objective was to provide "quality care consistent with professional standards." *Id.* In service of these goals, the policy directed that "[e]mergency dental care will be available to all inmates on a 24-hour basis," including to inmates serving sentences of one year or less. *Id.* at US00542. The policy provides a non-exhaustive list of treatment needs that constitute "emergency care," including "relief of severe dental pain, . . . acute infections, . . . [and] extraction of non-restorable teeth." *Id.* Non-emergency or routine care, by contrast, would be prioritized and provided on a tiered basis. *Id.* at US00543. Inmates with "special designations," including those who were housed in "jail units for less than a 12 month period," would "have access to dental triage and emergency care only." *Id.* Barring an exception to the BOP Policy approved by the Chief Dentist, inmates would not be eligible to receive routine care until the conclusion of this twelve-month period. *Id.* For sentenced inmates serving over twelve months in BOP custody, the BOP Policy provided for elective non-emergency dental care as long as "resources of staff, time, and materials are available, and commensurate with the inmate's ability to maintain good oral health." *Id.* Non-emergency or routine care includes hygiene appointments and radiographs. *Id.*

In addition to the BOP Policy represented in Program Statement 6400.02, plaintiff alleges that MDC maintained a second, unwritten policy that required pretrial detainees to wait for twelve months to receive even emergency dental treatment. *See* Pl.'s Suppl. 56.1 Resp. ¶ 3, ECF No. 90. He asserts that Dr. Hamilton refused to provide him with emergency care to treat his dental condition, instead informing him that he needed to wait for twelve months before he could obtain the necessary treatment. *Id.* ¶¶ 3, 5; *see also* Pl.'s Additional Material Facts ¶ 5, ECF No. 90. Defendants argue in response that "there is simply no *evidence* to support [plaintiff's] assertion that there was some other policy in existence." Defs.' Reply 8, ECF No. 92. Furthermore, they

note that plaintiff's summary of Dr. Hamilton's statement—in which he alleges that she told him that he would have to wait for twelve months to receive *routine* care—"is nothing more than an accurate statement of Program Statement 6400.02." *Id.*

## C. Procedural Background

On August 14, 2018, I granted in part and denied in part defendants' motion for partial summary judgment. *See Ojo v. United States*, No. 15-cv-6089, 2018 WL 3863441 (E.D.N.Y. Aug. 14, 2018). As a result of my order, ten out of twelve of plaintiff's causes of actions were dismissed. *Id.* at *11. Because defendants did not move for summary judgment on plaintiff's negligence claim under the Federal Tort Claims Act ("FTCA"), that claim survived the motion. *Id.* Additionally, I denied defendants' motion for summary judgment on plaintiff's *Bivens* equal protection claim, concluding that defendants had not demonstrated that they were entitled to judgment as a matter of law. *Id.* I expressly held, however, that defendants may renew this motion on alternate grounds, including by arguing that plaintiff is not entitled to a *Bivens* remedy under the standard established in *Ziglar v. Abbasi*.[3]

In their renewed motion, defendants do just that, arguing that Supreme Court precedent forbids plaintiff from pursuing a *Bivens* equal protection claim in this context. First, they allege that plaintiff's equal protection claim, brought under the Fifth Amendment, arises in a distinct context from previously recognized *Bivens* claims and that special factors counsel against the court

---

[3] Because defendants raised the argument that plaintiff had no *Bivens* remedy for his asserted equal protection violation for the first time in a footnote to their reply brief, I declined to consider it. *Ojo*, 2018 WL 3863441, at *11 n.8. However, I authorized them to address this issue, among any others, in a renewed motion that would more fully explore the complex questions of law raised by this argument. *See id.* My decision is consistent with the Supreme Court's decision to remand a portion of the case in *Ziglar v. Abbasi* due to the Court's recognition that the context-specific *Bivens* analysis is benefitted by a "comprehensive presentation by the parties." 137 S. Ct. at 1865 (plurality opinion).

implying a new *Bivens* remedy here. Defs.' Br. 5–8, ECF No. 83. In the alternative, they argue that plaintiff's claim must be dismissed because the asserted BOP policy survives rational basis review, and, moreover, the individual defendants named in plaintiff's complaint are not alleged to have created the unconstitutional policy. *Id.* 8–9. Defendants moved for summary judgment on this claim in September 2018, and the motion was fully briefed in February 2019. In his opposition to defendants' motion, plaintiff also moves for reconsideration of the court's order dismissing his eighth, ninth, and tenth causes of action on the basis of qualified immunity. *See* Pl.'s Opp'n 8–11; *Ojo*, 2018 WL 3863441, at *8–10.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact" and that she "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence could permit a reasonable jury to reach a verdict for either side." *Aetna Cas. & Ins. Co. v. United States*, 685 F. Supp. 334, 336 (E.D.N.Y. 1988). Materiality, on the other hand, "runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and carries the burden of demonstrating that there are no genuine disputes regarding material facts, *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). The court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If the nonmoving party fails to provide any "proof concerning an essential element of the nonmoving party's case," the moving party is entitled to summary judgment.

*Celotex Corp.*, 477 U.S. at 323.

## DISCUSSION

Plaintiff's *Bivens* equal protection claim stems from his assertion that BOP's dental care policy unconstitutionally discriminated against pretrial detainees. There are several ways to interpret this claim, and, because plaintiff is *pro se*, I interpret his pleadings liberally "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 472 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)). First, plaintiff's complaint can be construed as a challenge to the written BOP Policy provided by defendants, which indisputably results in the denial of routine dental care to inmates housed in jail units for less than twelve months. Liberally read, however, plaintiff alleges a second, unwritten policy maintained by defendants: he asserts that defendants also denied *emergency* dental care to pretrial inmates. Though defendants argue that plaintiff's sole evidence for this assertion is his own inconsistent and ambiguous recollection, this allegation raises a genuine dispute regarding the existence of a second policy.[4] *See, e.g.*, *ScentSational Techs., LLC v. PepsiCo, Inc.*, No. 13-CV-

---

[4] Plaintiff's pleadings permit at least two other interpretations of his claim. First, plaintiff asserts that his severe dental pain should have entitled him to receive emergency rather than routine care—a point echoed by defendants. *See* Defs.' Br. 8 (noting that the BOP Policy's description of emergency care matches "precisely the types of complaints that Plaintiff now claims were not addressed"); Pl.'s Suppl. 56.1 Resp. ¶ 5. To the extent that this argument can be interpreted as a class-of-one equal protection claim, it fails because plaintiff does not identify similarly situated individuals who were treated differently by the defendants. *See Crippen v. Town of Hempstead*, No. 07-CV-3478 (JFB)(ARL), 2013 WL 1283402, at *9 n.5 ("A plaintiff's failure to introduce 'any evidence of similarly situated' comparators to oppose a motion for summary judgment is grounds for dismissal of a class-of-one claim." (quoting *Maulding Dev., LLC v. City of Springfield*, 453 F.3d 967, 971 (7th Cir. 2006)); *see also Ojo*, 2018 WL: 3863441, at *10. Second, plaintiff may be alleging negligence on the part of the MDC officials who concluded that his condition warranted routine, rather than emergency, treatment. If plaintiff intends to pursue this claim, he may continue to do so through his FTCA negligence claim. *Cf.* Defs.' Reply 8. This claim does not rest on an equal protection violation; as such, it is inapplicable to defendants' current motion and I do not consider it here.

8645 (KMK), 2017 WL 4403308, at *12 (S.D.N.Y. Oct. 2, 2017) (concluding that, despite a "perceived dearth of evidence," the "limited evidence Plaintiff has proffered is sufficient to create genuine disputes of material fact"); *see also* Pl.'s Supplemental 56.1 Resp. ¶ 3 (asserting that, solely as a result of his status as a pretrial detainee, "Plaintiff was subjected to a policy that mandated" that he "wait for 12 months before . . . emergency care can be provided").

In order for plaintiff to maintain his policy-based equal protection claims, he must demonstrate that his claims give rise to a *Bivens* remedy, entitling him to damages for the unconstitutional treatment he allegedly suffered at the hands of MDC officials. The existence or non-existence of a private right of action under *Bivens* is, thus, a threshold question that must be resolved before the court can analyze the merits of plaintiff's claims.[5] I first consider plaintiff's right to a *Bivens* remedy before turning to his motion for reconsideration.

I.    **Plaintiff's Equal Protection *Bivens* Claim Is Dismissed Because Special Factors Counsel Against Implying a Cause of Action for Damages.**

---

[5] Even if plaintiff could maintain a *Bivens* cause of action, defendants argue that his equal protection claim would fail because the BOP Policy is justified by a legitimate government interest. *See* Defs.' Br. 9. "[E]qual protection requires that 'pretrial detainees not be treated less favorably than convicted persons, unless the difference in treatment is justified by a legitimate government interest.'" *Parkell v. Morgan*, 682 F. App'x 155, 159 (3d Cir. 2017) (quoting *Lock v. Jenkins*, 641 F.2d 488, 497 (7th Cir. 1981)). Because pretrial detainees are not a "suspect class," defendants need only demonstrate that the policy is rationally related to a legitimate government interest. *See, e.g.*, *Johnson v. Merlak*, No. 4:18-cv-1062, 2018 WL 5295876, at *3 (N.D. Ohio Oct. 25, 2018). With respect to the written BOP Policy, defendants assert that the provision of routine dental care is limited in order to ensure "effective resource allocation." Defs.' Br. 9. Even without a heightened evidentiary showing, this interest would likely be sufficient to survive rational basis review. *See Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993) ("A State . . . has no obligation to produce evidence to sustain the rationality of a statutory classification."); *see, e.g.*, *Hogan v. Russ*, 890 F. Supp. 146, 148 (N.D.N.Y. 1995) ("[T]he state's interest in efficiently distributing its limited resources is sufficient reason not to provide extensive specialized medical care for inmates."). However, plaintiff's assertion that there was a second policy, pursuant to which emergency care was denied to pretrial detainees, complicates matters. Defendants do not argue that this second policy, if it exists, would be justified by a legitimate interest, nor am I prepared to find that it is. Therefore, I cannot resolve this motion on the merits based on an assumption, *arguendo*, that a *Bivens* claim exists, and I instead must engage in the analysis dictated by *Ziglar v. Abbasi*, 137 S. Ct. 1843.

A cause of action brought under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), allows a plaintiff to sue a federal employee in his individual capacity to redress a constitutional violation. *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994). Here, plaintiff seeks damages for the alleged violation of his Fifth Amendment right to equal protection. *See Washington v. Davis*, 426 U.S. 229, 239 (1976) ("[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

## A. The Development of the *Bivens* Action

Though 42 U.S.C. § 1983 created a money damages remedy for people who claimed constitutional violations on the part of state officials, Congress did not establish a corresponding right for individuals to sue federal officials. Addressing this disparity in 1971, the Supreme Court decided *Bivens*, which created an implied right of action for an injured plaintiff to sue federal officers for a Fourth Amendment violation. 403 U.S. at 397. "In the decade that followed, the Court recognized what has come to be called an implied cause of action in two cases involving other constitutional violations." *Ziglar*, 137 S. Ct. at 1854. Along with *Bivens*, these cases—*Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson v. Green*, 446 U.S. 14 (1980)—"represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar*, 137 S. Ct. at 1855. In *Davis*, the Court held that the Fifth Amendment provided a damages remedy for a claim of gender discrimination, allowing the administrative assistant of a Congressman to sue her former employer after she was fired because she was a woman. *See* 442 U.S. at 248. The *Davis* Court found that the Congressman's recent electoral defeat meant that "equitable relief in the form of reinstatement would be unavailing," and that the federal courts

were well-equipped to evaluate the plaintiff's gender discrimination claim. *Id.* at 245. In *Carlson v. Green*, the Court allowed a prisoner's estate to pursue an Eighth Amendment claim that federal officials failed to provide adequate medical treatment to the prisoner after he died in federal custody. *See* 446 U.S. at 18–19. The Court held that the availability of a claim under the FTCA was insufficient to protect the prisoner's constitutional rights, "and without a clear congressional mandate," the Court would not infer that Congress intended the FTCA to replace a *Bivens* remedy. *Id.* at 23.

After *Carlson*, however, "the Court adopted a far more cautious course before finding implied causes of action." *Ziglar*, 137 S. Ct. at 1855. "[T]he [Supreme] Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). In *Ziglar*, decided in 2017, the Court "re-emphasized that courts should not imply rights and remedies as a matter of course, 'no matter how desirable that might be as a policy matter, or how compatible with the statute [or constitutional provision].'" *Sanford v. Bruno*, No. 17-cv-5132 (BMC), 2018 WL 2198759, at *4 (E.D.N.Y. May 14, 2018) (alteration in original) (quoting *Ziglar*, 137 S. Ct. at 1856). *Ziglar* established a multi-part inquiry[6] in which courts must engage before implying a *Bivens* remedy. *Id.* at *5.

First, the court must determine whether the particular *Bivens* remedy asserted arises in a "new" context, distinct from the three Supreme Court cases in which *Bivens* remedies have been implied. *Ziglar*, 137 S. Ct. at 1859–60. "[E]ven a modest extension is still an extension," and the

---

[6] Though some judges describe the *Ziglar* test as a "rigorous two-step inquiry," *Sanford*, 2018 WL 2198759, at *5, others note that the test can be characterized in three separate parts, *see, e.g.*, *Ziglar*, 137 S. Ct. at 1876 (describing three steps in the majority's test) (Breyer, J. dissenting); *Turkmen v. Ashcroft*, No. 02-CV-2307 (DLI) (SMG), 2018 WL 4026734, at *5–9 (E.D.N.Y. Aug. 13, 2018) (analyzing "alternative remedies" separately from the "two steps"). Because I find that an analysis of alternative remedies is best addressed separately from a consideration of other, overarching "special factors," I divide my analysis into three parts.

central inquiry revolves around whether "the case is different in a meaningful way from previous *Bivens* cases." *Id.* at 1859, 1864. Without providing an exhaustive list, the Court noted that such factors as "the rank of the officers involved," "the constitutional right at issue," and the "statutory or other legal mandate under which the officer was operating" are relevant considerations in distinguishing *Bivens* contexts. *Id.* at 1860; *see also Sanford*, 2018 WL 2198759, at *5 (observing that the test is "context-specific" and the court must determine whether the new *Bivens* action involves "a new context or [is brought] against a new category of defendants"). If the claim arises in a new context, the court must consider whether the plaintiff has at his disposal "an alternative remedial structure" that would provide the same or similar relief in the absence of an implied remedy. *Ziglar*, 137 S. Ct. at 1858. Finally, the court must evaluate any "special factors necessarily implicated" by the *Bivens* claim and determine whether those factors demonstrate that the availability of a damages action in this context "is a decision for the Congress to make, not the courts." *Id.* at 1860. All three parts of the inquiry revolve around separation-of-powers concerns, requiring the court to analyze "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. Put differently, a special factor is any consideration that "counsels hesitation" before the court endeavors to imply a remedy, suggesting that "Congress might doubt the efficacy or necessity of a damages remedy" in the particular context at issue. *Id.* at 1858, 1862.

Before I apply the test established in *Ziglar* to plaintiff's equal protection claim, it is useful to consider the particular *Bivens* claims evaluated by the Supreme Court in *Ziglar* and the Court's decision regarding their viability. In that case, the plaintiffs asserted four *Bivens* claims; three of their claims, analyzed by the Court collectively as "detention policy claims," challenged the actions of executive officials taken pursuant to a formal policy adopted after the September 11

terrorist attacks. *Id.* at 1858. Specifically, the plaintiffs in *Ziglar* argued that the federal officials maintained a policy that violated plaintiffs' "due process and equal protection rights by holding them in restrictive conditions of confinement" on the basis of their race, religion, ethnicity, or national origin. *Id.* at 1853, 1858. The Court found that these claims arose in a new *Bivens* context, in part because they involved a challenge to a "high-level executive policy"—a factual condition that did not exist in the three previous Supreme Court *Bivens* cases. *Id.* at 1860. The Court also ruled that there were alternative remedies available to the plaintiffs to challenge this policy, including injunctive and habeas relief. *See id.* at 1862–63 (observing that a challenge to "large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners" can be addressed through a motion for an injunction). Ultimately, the court held that the the the special factors implicated by a challenge to a broad national security policy counseled hesitation before the court could create a judicially-implied remedy for money damages. *Id.* at 1861.

Separately, the Court found that plaintiffs' fourth *Bivens* claim—a claim that an individual warden had violated the plaintiffs' Fifth Amendment rights by allowing them to be abused by prison guards—should be remanded to the court below for a "special factors" analysis. *Id.* at 1865 (plurality opinion). Unlike the "detention policy" claims, the abuse claim implicated the unconstitutional actions of an individual officer who was alleged to have *violated* an official policy, rather than acting pursuant to an allegedly unconstitutional policy. *See id.* at 1864. The Court found that this claim arose in a new context, even though "[t]he differences between [it] and the [claim recognized] in *Carlson*" were limited. *Id.* at 1865. It concluded that the lower court was in a better position to conduct the necessary analysis and determine whether to allow the claim to

move forward. *Id.* (plurality opinion).[7]

The *Ziglar* Court's analysis, therefore, centered on the existence of a high-level executive policy. The Court held that such a policy was an important factor in determining the permissibility of a *Bivens* action, particularly as it pertained to the identification of "special factors." *See id.* at 1860. ("[I]t must be noted that a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). It is with this principle in mind that I proceed to an analysis of Ojo's equal protection *Bivens* claim.

### B. The Court Declines to Imply a *Bivens* Remedy for Plaintiff's Equal Protection Claim.

### A. New Context

The first step in the *Ziglar* analysis is easily satisfied here; while plaintiff's equal protection claim shares some characteristics with previous *Bivens* cases decided by the Supreme Court, "[t]he conclusion that [plaintiff's] case arises in a context meaningfully different [from those cases] is ineluctable." *Lanuza v. Love*, 899 F.3d 1019, 1028 (9th Cir. 2018). Though the Supreme Court recognized a *Bivens* remedy for a Fifth Amendment equal protection violation in *Davis*, that case involved a gender discrimination claim in the context of an employment relationship, distinguishing it from plaintiff's prison dental policy claim here. *See Huckaby v. Bradley*, No. 1:16-cv-4327 (NLH/KMW), 2018 WL 2002790, at *4 (D. N.J. Apr. 30, 2018) ("[T]he fact that

---

[7] Plaintiff argues that the Supreme Court's decision to remand rather than dismiss one of plaintiffs' *Bivens* claims in *Ziglar* is relevant to his claim in the instant motion. *See* Pl.'s Opp'n 6. However, as I discuss below, *see infra* Section B.3, plaintiff's *Bivens* claim has more in common with the "detention policy" claims that were dismissed in *Ziglar* than the abuse claim that was remanded. Moreover, on remand, Magistrate Judge Gold recommended dismissal of the *Ziglar* plaintiffs' last *Bivens* claim, concluding that the *Ziglar* Court had "confined *Bivens* to an extremely narrow space[,] . . . [which] is too narrow to accommodate plaintiffs' remaining abuse claim." *Turkmen*, 2018 WL 4026734, at *14. The plaintiffs in that case filed objections to Judge Gold's report and recommendation, and Chief Judge Irizarry has not yet ruled on whether to adopt or modify the recommendation. *See* Docket, *Turkmen v. Ashcroft*, No. 02-cv-2307 (E.D.N.Y.).

this suit is also brought under the Fifth Amendment Due Process Clause does not bring it within the confines of *Davis*."), *appeal docketed*, No. 18-2204 (3d Cir. June 1, 2018); *see also Brown v. Cooper*, No. 18-219 (DSD/BRT), 2018 WL 6977594, at *12 (D. Minn. Dec. 11, 2018) (distinguishing between "discrimination in an employment setting" and "a correctional setting" for the purpose of the "new context" analysis), *adopted by* 2019 WL 121943 (D. Minn. Jan. 7, 2019), *appeal docketed*, No. 19-1387 (8th Cir. Feb. 26, 2019); *cf. Alexander v. Ortiz*, No. 15-6981 (JBS-AMD), 2018 WL 1399302, at *4 (D. N.J. Mar. 20, 2018) (concluding that plaintiff's claim of discrimination in the prison employment context was sufficiently distinct from *Davis* to constitute a new context), *appeal docketed*, No. 18-1778 (3d Cir. Apr. 13, 2018); *Turner v. Doe*, No. 15-5942 (RBK) (AMD), 2018 WL 2278096, at *4 (D. N.J. May 18, 2018) (same). Likewise, "[w]hile *Carlson* extended the *Bivens* remedy to prisoners, it only did so for Eighth Amendment denial of medical care claims." *Turner*, 2018 WL 2278096, at *4; *see also Sanford*, 2018 WL 2198759, at *5 (contrasting a due process violation in the prison context with "an Eighth Amendment violation resulting in a prisoner's death").

The court is aware of just one case in which a non-identical *Bivens* claim was found to arise in the same context as one of the three previous Supreme Court *Bivens* cases. In *Laurent v. Borecky*, Judge Chen concluded that a pretrial detainee's Fifth Amendment claim for deliberate indifference to serious medical needs was so similar to the *Bivens* claim recognized in *Carlson* that it did not arise in a new context; as a result, the court did not engage in a "special factors" analysis. No. 17-CV-3300 (PKC)(LB), 2018 WL 2973386, at *4–5 & nn. 3–4 (E.D.N.Y. June 12, 2018). Judge Chen's conclusion rested, in part, on the fact that the claims in *Laurent* and *Carlson* were indistinguishable aside from the plaintiff's pretrial status, which forced him to pursue his claim under the Fifth Amendment as opposed to the Eighth Amendment. *Id.* In contrast, Ojo's

equal protection claim shares few characteristics with either *Carlson* or *Davis*; while it, like *Davis*, involves the Fifth Amendment, plaintiff's claim is based on a prison policy that distinguishes between groups of people based on their membership in a non-suspect class, rather than their gender. Likewise, while plaintiff's equal protection claim necessarily intersects with his claim that he received inadequate dental treatment at MDC, his policy-based claim is distinct from the deliberate indifference claim recognized in *Carlson*.[8]

As a result, I conclude that plaintiff's equal protection claim arises in a new context, and I proceed to the second and third steps of the *Ziglar* analysis.

## B. Available Alternative Remedies

The availability of alternative judicial or administrative remedies is relevant to the *Ziglar* analysis, but "[t]he lack of an alternative remedy for damages does not necessarily mean the Court should extend *Bivens*." *Alexander*, 2018 WL 1399302, at *7. It is undisputed that plaintiff had no other remedies for obtaining money damages for his alleged equal protection violation, but defendants argue that plaintiff had several alternative remedies that would have allowed him to pursue his claim in other ways, including by seeking injunctive or habeas relief or by pursuing BOP administrative remedies. *See* Defs.' Br. 7–8. Defendants also note that the FTCA, which allowed plaintiff to bring a negligence claim against the United States for money damages, would entitle him to money damages for closely-related conduct, even though it would not encompass the asserted equal protection violation itself. Defs.' Reply 7–8.

I agree that there were alternative channels that plaintiff could have pursued, though I find

---

[8] Plaintiff previously asserted three causes of action that I collectively interpreted as a single claim that defendants were deliberately indifferent to his serious medical needs. In August, I dismissed these causes of action after concluding that the defendants were entitled to qualified immunity. *See Ojo*, 2018 WL 3863441, at *7–10; *see also infra*, Part II.

that the record is slightly more ambiguous than defendants suggest. Plaintiff could have pursued injunctive or declaratory relief to challenge and seek alterations to the BOP Policy affecting the provision of dental care. *See Malesko*, 534 U.S. at 74 ("[U]nlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). Likewise, the *Ziglar* Court suggests that a petitioner in Ojo's position could seek habeas relief to challenge the conditions of his confinement, even if his petition did not challenge the length of his sentence. 137 S. Ct. at 1862–63; *see also Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 60 (E.D.N.Y. 2017) (citing *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001)), *aff'd*, No. 17-3790-cv (2d Cir. 2018). At the same time, plaintiff is correct that neither a prospective injunction nor a habeas remedy would have compensated him for the damages already suffered as a result of the policy, *see* Pl.'s Opp'n 7, and the Supreme Court has previously suggested that a remedy is not a sufficient alternative unless its efficacy is "equal[]" to the damages remedy sought through a *Bivens* claim, *Carlson*, 446 U.S. at 19; *but see Gonzalez*, 269 F. Supp. 3d at 62 ("[T]here is no precedent suggesting that the unavailability of money is a factor that carries any weight in determining the expansion of a *Bivens* remedy.").

Furthermore, while defendants note that plaintiff could have pursued administrative remedies to challenge the policy, plaintiff argues that he attempted to utilize these channels but was prevented from doing so by the defendants. Pl.'s Opp'n 7–8; *see also Turkmen v. Ashcroft*, No. 92-CV-2307 (DLI) (SMG), 2018 WL 4026734, at *11–12 (E.D.N.Y. Aug. 13, 2018) (concluding that administrative grievance forms did not provide an alternative remedy where plaintiffs persuasively alleged that "their conditions of confinement precluded them, as a practical matter, from filing a grievance or pursuing either injunctive or habeas relief"). And while it is true

that plaintiff could—and, in fact, *did*—pursue a claim for money damages under the FTCA, that fact alone may not be dispositive. Indeed, *Carlson* itself considered the availability of an FTCA claim before concluding that Congress "made it crystal clear that [it] views FTCA and *Bivens* as parallel, *complementary* causes of action." 446 U.S. at 20 (emphasis added). The Court in *Carlson* held that the FTCA protects rights that are distinct from those protected by a *Bivens* action; while the FTCA authorizes a plaintiff to pursue a cause of action as long as the state would permit one in the same circumstance, a *Bivens* claim authorizes a suit for money damages for the violation of a federal constitutional right—a claim of such importance that it should not "be left to the vagaries of the laws of the several States." *Id.* at 23. Since then, many post-*Ziglar* cases have suggested that *Ziglar* requires a reevaluation of the FTCA analysis conducted by the Court in *Carlson*. *See, e.g.*, *Huckaby*, 2018 WL 2002790, at *5–6; *Morgan v. Shivers*, No. 1:14-cv-7921-GHW, 2018 WL 618451, at *6 (S.D.N.Y. Jan. 29, 2018). However, the *Ziglar* Court was careful to note that the three *Bivens* cases, including *Carlson*, are "settled law"—even if their outcome "might have been different if they were decided today." 137 S. Ct. at 1856–57; *see also Linlor v. Polson*, 263 F. Supp. 3d 613, 621 (E.D. Va. 2017) (concluding, post-*Ziglar*, that "[a]n FTCA claim is simply not 'a substitute for a *Bivens* action" (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983))).

Ultimately, I need not determine whether the alternative remedies here were sufficiently effective to meet the standard set in *Ziglar*, as I find that there are other special factors that urge against the implication of a *Bivens* remedy.

### C. Special Factors

"The threshold for concluding that a factor counsels hesitation 'is remarkably low. . . . Hesitation is a pause, not a full stop . . . ." *Turkmen*, 2018 WL 4026734, at *9 (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009)). In *Ziglar*, the Supreme Court instructed that the

"special factors" analysis revolves around the question of whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy." 137 S. Ct. at 1858. Here, I conclude that there are two important special factors that counsel against inferring a damages remedy: (1) the fact that plaintiff challenges a large-scale policy, rather than the rogue conduct of individual employees, and (2) the fact that plaintiff's claim implicates complicated questions of prison resource allocation, an area in which courts have traditionally been highly deferential.

First, as *Ziglar* itself demonstrates, a *Bivens* action has never been considered "a proper vehicle for altering an entity's policy." 137 S. Ct. at 1860 (quoting *Malesko*, 534 U.S. at 74). Instead, *Bivens* claims are intended to be "brought against the individual official for his or her own acts, not the acts of others." *Id.* When a plaintiff's *Bivens* claim is actually a challenge to the policies and actions of an entity, injunctive relief has traditionally been the preferred course of action, rather than a remedy that seeks to impose damages liability on specific officers. *See Malesko*, 534 U.S. at 74. Here, plaintiff argues that a generally applicable, broad policy—enforced and maintained by defendants—unconstitutionally discriminated against pretrial detainees. The policy plaintiff challenges is either a BOP-wide policy, as represented by the BOP Policy statement provided by defendants, or an MDC-wide policy, unwritten but enforced by Dr. Hamilton and other MDC officers. Either way, adjudication of plaintiff's claim "would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies," thus "requir[ing] courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Ziglar*, 137 S. Ct. at 1860–61. That factor alone, the *Ziglar* Court urges, should counsel hesitation, encouraging courts to stay their hands rather than interfere in a sensitive area better reserved for congressional decision-making.

Courts interpreting *Ziglar* have recognized the centrality of the policy distinction to the Supreme Court's conclusion. In *Lanuza v. Love*, for example, the Ninth Circuit Court of Appeals distinguished the *Bivens* claim at issue in that case—a claim against an individual immigration official accused of fabricating documents—from the "detention policy" claims in *Ziglar*. 899 F.3d at 1028–29. The court acknowledged that many *Bivens* claims are "necessarily intertwined with the execution of . . . policy," but observed that there is a marked difference between a plaintiff's challenge to the acts of a particular officer and a challenge that ultimately seeks to alter a policy developed and enforced by the political branches. *Id.* at 1029; *see also Zavala v. Rios*, 721 F. App'x 720, 721–722 (9th Cir. 2018) (holding that a challenge to "a prison-wide policy of declining to provide notice to inmates" could not support a *Bivens* claim, as injunctive and declaratory relief were readily available). In other words, there is an important distinction between an "overarching challenge[] to federal policy," and a "claim[] against . . . individual officers for their alleged 'overreach.'" *Jacobs v. Alam*, No. 17-2159, 2019 WL 489060, at *5 (6th Cir. Feb. 8, 2019) (quoting *Ziglar*, 137 S. Ct. at 1862)).

The fact that plaintiff challenges a policy in the context of a federal prison also requires additional pause. The policy to which plaintiff objects involves prison administration and resource allocation, areas that "require[] expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Alexander*, 2018 WL 1399302, at *7 (quoting *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)). "Of course, a policy of judicial restraint does not include failure to take cognizance of prisoners' valid constitutional claims." *Vaughn v. Kerley*, 897 F. Supp. 1413, 1421 (M.D. Fla. 1995) (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). But it would be inappropriate for the court to imply a remedy for damages in an area that is uniquely "within the province and professional

expertise of corrections officials." *Pell v. Procunier*, 417 U.S. 817, 827 (1974); *cf. Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (citations omitted)).[9]

One final aspect of plaintiff's lawsuit compels the conclusion that he may not pursue a *Bivens* claim for his equal protection challenge. Here, plaintiff seeks to hold certain high-level MDC officials—including the Warden, Assistant Warden, and MDC Medical Director—financially responsible for a broader institutional policy. Yet because he does not allege that any of the individual officers were actually involved in drafting that policy, he cannot meet his burden of demonstrating that these officers were directly responsible for the constitutional injury he suffered. *See Iqbal*, 556 U.S. at 676–77 (holding that a plaintiff alleging discrimination in a *Bivens* action brought under the First and Fifth Amendments must prove that the defendant "acted with discriminatory purpose," which requires a showing that the defendant himself is responsible for the misconduct (citations omitted)). In other words, to survive the motion, plaintiff would have to premise defendants' liability on either "direct involvement in the constitutional violation or creation of a policy that sanctioned it." *Overby v. Fabian*, No. 17-CV-3377 (CS), 2018 WL 3364392, at *12 (S.D.N.Y. July 10, 2018). At best, plaintiff alleges that defendants "knew of and acquiesced to a constitutional violation," which is insufficient to support a finding of liability after

---

[9] The *Ziglar* Court also suggested that Congress's passage of the Prison Litigation Reform Act ("PLRA") in 1995 is an additional factor cautioning against the court's implication of a damages remedy. 137 S. Ct. at 1865. The PLRA does not authorize a damage remedy for inmates alleging prison abuse. *Id.* The Court suggested that Congress's silence regarding the availability of a damages remedy may be particularly notable in a case like this, because "high-level policies [are assumed to] attract the attention of Congress." *Id.* at 1862; *but see Turkmen*, 2018 WL 4026734, at *8 (declining to hold that congressional silence in the passage of the PLRA was a special factor because "[i]nferring intention from inaction necessarily involves speculation").

*Iqbal. Id.* (quoting *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801(SAS), 2009 WL 183539, at *6 (S.D.N.Y. June 26, 2009)); *see also* Defs.' Br. 9. This fact further demonstrates that plaintiff's equal protection *Bivens* claim is untenable, providing additional context for the conclusion that plaintiff's claim is better suited as a claim for injunctive relief against an *entity* rather than a claim against individual officers.

As a result, I conclude that "the special factors necessarily implicated" by plaintiff's dental policy equal protection claim demonstrate that plaintiff is not entitled to an implied damages remedy, *Ziglar*, 137 S. Ct. at 1860. His equal protection *Bivens* claim is therefore dismissed.

## II. Plaintiff's Motion for Reconsideration Is Denied.

In plaintiff's opposition to defendants' motion for summary judgment, he seeks reconsideration of one aspect of the court's August 14, 2018 order.[10] *See* Pl.'s Opp'n 8–11. When I granted summary judgment to defendants on ten out of twelve of plaintiff's claims, I held that "there is no clearly established law as to whether [defendants'] conduct constituted personal involvement." *Ojo*, 2018 WL 3863441, at *8. Specifically, I concluded that at the time of the events described in plaintiff's complaint, courts within the Second Circuit disagreed about whether a defendant's "knowledge and acquiescence" to a constitutional violation could give rise to personal involvement in a "deliberate indifference" *Bivens* claim. *See id.* at *9. This disagreement entitled defendants to qualified immunity on that claim "based on the very uncertainty of the governing law." *Id.* at *10.

Plaintiff's motion for reconsideration provides no reason for me to disturb this conclusion.

---

[10] Defendants correctly observe that plaintiff's motion, filed over four months after the court's August 2018 decision, is untimely as a motion for reconsideration. *See* Defs.' Reply 9; Local Civil Rule 6.3 ("[A] notice of motion for reconsideration or reargument . . . shall be served within fourteen (14) days after the entry of the Court's determination of the original motion . . . . .").

*See, e.g.*, *Yurman Design, Inc. v. Chaindom Enters., Inc.*, No. 99CIV9307 JFK KNF, 2000 WL 1877086, at *1 (S.D.N.Y. Dec. 27, 2000) ("A motion for reconsideration typically is granted only where the moving party demonstrates that the court has overlooked factual matters or controlling legal precedents that were presented to it in connection with the underlying motion."). To support his motion, plaintiff cites to the Second Circuit's decision in *Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), which was reversed on other grounds by the Supreme Court in *Ziglar*. *See* Pl.'s Opp'n 9. Plaintiff is correct that some courts have held that *Turkmen v. Hasty* resolved the circuit-wide "conflict" I referenced in my previous opinion. *See, e.g.*, *Zenon v. Downey*, No. 9:18-CV-0458 (LEK/ATB), 2018 WL 6702851, at *7 (N.D.N.Y. Dec. 20, 2018); *Stephens v. Venettozzi*, No. 13-CV-5779 (RA) (DF), 2016 WL 929268, at *12 (S.D.N.Y. Feb. 24, 2016). However, district courts have been mixed in their reception of *Turkmen v. Hasty*, and some courts argue that the supervisory liability standard remains in flux. *See, e.g.*, *Overby*, 2018 WL 3364392, at *12 (observing, in 2018, that "the Second Circuit has yet to speak definitively" on this question); *A.K. v. Annucci*, No. 17 CV 769 (VB), 2018 WL 4372673, at *6 n.3 (S.D.N.Y. Sept. 13, 2018) (noting that "district courts within this circuit" remain divided, and "[t]he Second Circuit has yet to resolve this dispute," even while describing the decision in *Turkmen v. Hasty* (citing *Marom v. City of New York*, No. 15-cv-2017 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016))).

Ultimately, I need not resolve the question of whether *Turkmen v. Hasty* clarified and settled the supervisory liability standard in the Second Circuit. *Turkmen v. Hasty* was decided in June 2015, well after the events that gave rise to plaintiff's deliberate indifference claim. *Compare Turkmen v. Hasty*, 7890 F.3d 218, *with* Pl.'s Am. Compl. ¶ 37, ECF No. 23 (referring to events from "July 11, 2011 through and including March 14, 2014"). When evaluating a defendant's right to qualified immunity, a court looks only to the state of the law as it existed during the time of the

acts in question. *See Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004). Indeed, "[i]t would defy logic to analyze qualified immunity . . . in terms of unpredictable subsequent events, and courts have repeatedly declined to frame the clearly established inquiry through the '20/20 vision of hindsight.'" *Hanrahan v. Doling*, 331 F.3d 93, 99 (2d Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).[11] Accordingly, plaintiff's motion for reconsideration is denied.

## CONCLUSION

For the reasons described above, defendants' motion for summary judgment on plaintiff's *Bivens* equal protection claim is granted, and plaintiff's motion for reconsideration of the court's previous decision is denied. At this time, only one claim remains in plaintiff's case: his FTCA negligence claim against the United States. If defendants do not intend to move for summary judgment on this claim, the parties must either proceed to settlement or a bench trial.


SO ORDERED.


Date:  March 4, 2019                                    _____/s/_____
       Brooklyn, New York                               Allyne R. Ross

---

[11] Moreover, the fact that the Second Circuit in *Turkmen v. Hasty* found that the defendants there were not entitled to qualified immunity is irrelevant, as the events in that case occurred in the early 2000s—well before the Supreme Court decided *Iqbal*, giving rise to the conflict I described in my August 2018 opinion.